June, 1813.

WILLIAM HILLHOUSE, jun. and JOSIAH B. MORSE *against* AARON SMITH, LUCIUS SMITH, SAMUEL CARTER, JOHN WELCH, JAMES BIRGE and DANIEL POTTER.

*A., B.* and *C.* were equally interested, as partners, in certain inventions, for which they had, severally, obtained patents. *A.*, by false and fraudulent representations, induced *D.* to purchase the right of using such inventions, for which *D.* executed and delivered to him, sun-

MOTION for a new trial.

This was a petition praying for an injunction against the prosecution of certain suits at law, upon sundry promissory notes, made and executed by the petitioners to one *Timothy Kirk*, for the consideration of the assignment of certain patent rights.

On the hearing, it was proved, that *Kirk*, one *Samuel Bolton* and one *James Truman*, had, severally, obtained patents for inventions to be used in heating water and other liquids, by means of tubes, worms and grates; that afterwards, on the 10th of *October*, 1809, the patentees, by an agreement for that purpose, united their several patents, and upon certain conditions and reservations, each became equally interested in the invention of the others, and each was authorised

dry promissory notes; which notes, *A.*, soon afterwards, assigned to *E.* At the time of the assignment of the notes, *D.* and *E.* were alike ignorant of any fraud on the part of *A.*, in obtaining them. Afterwards, *F.* entered into a contract with *B.*, wherein it was stipulated, that *F.* should assign to *B.* an equal moiety of his interest in such inventions, within certain limits, the right of using which inventions, *F.* had previously purchased of *A.* and his associates; that *F.* should advance to *B.* a sum not exceeding 500 dollars, to enable him to introduce such inventions at certain saltworks; that *B.* should devote his personal services to effect this object, and make every exertion to bring such inventions into use, within the limits specified; and that *F.* should bear the expences of *B.* while employed in this business. In consideration of which, *B.* assigned to *F.* an equal moiety of his interest in such inventions, within certain other limits, and of the avails of all such sales as had been, or should thereafter be made within such limits. It was also agreed, that each party should have full power to act in this concern, and that each should account to the other, for all monies received or expended in the prosecution of this business; that the profits, after deducting the money advanced by *F.*, should be equally divided; that the expences should be equally borne, and that in case no profits should accrue, *F.* should sustain the loss of expences, and of the monies by him advanced. *F.* received the sum of 2000 dollars, as his proportion of the avails of the sale made by *A.* to *D.* In a petition in chancery brought by *D.* against *E.*, praying for an injunction against certain suits at law instituted by *E.* against *D.*, upon the notes assigned to *E.* by *A.*, *E.* offered to prove by the testimony of *F.*, that during the negotiation between *E.* and *A.*, relating to the purchase of the notes, *D.* represented to *E.* that he believed the inventions to be original, and that they were well secured by the patents, and that the notes might be safely purchased, and that he promised *E.* to pay them when they should become due. Held, that *F.* was directly interested in the event of the suit, and was, therefore, an incompetent witness.

to sell and convey the right of using the same, for their joint benefit; that in consequence of the representations of *Kirk*, relating to the utility of such inventions, the petitioners were induced to purchase the right of using the same; and on the 20th of *September*, 1810, *Kirk* assigned to them the right of using the same within certain limits, and in consideration of such assignment, the petitioners paid to him a large sum of money, and executed and delivered the notes above mentioned; and that the representations of *Kirk*, relating to the utility and originality of such inventions, were false and fraudulent.

It was also proved, that soon after the execution and delivery of the notes, *Kirk* assigned a part of them to *Aaron Smith* and *Lucius Smith*, and afterwards, such notes were, by the *Smiths*, assigned to the other respondents; and that suits had been commenced upon several of the notes, and that such suits were still pending.

It was further proved, that during the negotiation between *Kirk* and the *Smiths*, relating to the sale of the notes, the petitioners gave notice to them, that they entertained suspicions concerning the originality of the inventions of *Kirk* and others, having heard that a similar invention had been used in *Newport*, long before the date of their several patents, and that the petitioners had despatched a messenger to ascertain this fact; and that if their suspicions should be verified, the notes would not be paid; that on the return and report of the messenger, it was believed, that the invention used in *Newport*, was different, in principle, from the invention of the patentees, and thereupon, the *Smiths* completed the contract for the purchase of the notes. The *Smiths* and the petitioners were, at this time, alike ignorant of the practice of any fraud in relation to the sale to the petitioners, or in the means of obtaining the patents, by *Kirk* and others.

It was also proved, that during the pendency of this suit, *Kirk* and *Bolton* both died, and that their estates were insolvent; and that *Aaron Smith* took out letters of administration on the estate of *Kirk*, and entered his appearance as administrator.

Vol. V.                    E e e

It was claimed, on the part of the respondents, that during the negotiation between the *Smiths* and *Kirk* respecting the sale of the notes, the petitioners informed them, that they had doubts as to the originality of the inventions of *Kirk* and others, and requested them to suspend the purchase of the notes, until it could be ascertained whether such inventions were original or not; and that in case such inventions should be found not to be original, the notes would not be paid; that on the return of the messenger from *Newport,* as above stated, the petitioners informed the *Smiths,* that they were fully satisfied of the originality of the inventions, and that they were well secured by the patents, and that the notes might be safely purchased, and promised the *Smiths,* to pay the notes when they should become due. And for the purpose of proving these facts, the respondents offered one *James Sacket,* as a witness. The petitioners objected to the admission of his testimony, on the ground that he was interested in the event of the suit.

This objection was founded on the following facts. On the 22d of *September,* 1810, *Sacket* and *Bolton* entered into articles of agreement, by which *Sacket* sold and conveyed to *Bolton* one half of his right to use the above mentioned inventions within certain specified limits, including the counties of *New-Haven* and *Fairfield,* in the state of *Connecticut,* and one half of all the profits which should accrue from the introduction and use thereof within such limits; which right *Sacket* had previously purchased of *Kirk* and his associates. It was also stipulated, that *Sacket* should advance to *Bolton* a sum not exceeding 500 dollars, for the purpose of carrying such inventions into operation at certain salt-works within such limits. And it was provided, that *Bolton* should bestow his personal services, and use every exertion to effect this purpose; and also, to bring such inventions into use, within the limits specified. *Sacket* also agreed to bear the expences of *Bolton,* during the time he should be employed in this business.

*Bolton,* in consideration of the premises, on his part, assigned to *Sacket* the one half of his right to such inventions

in all the counties eastward and northward of the limits before mentioned, and also one half of the avails of all such sales as had then been made, and of such as should thereafter be made, within and for such counties, excepting *Dutchess* county, *Long-Island,* and the city and county of *New-York,* in the state of *New-York.*

It was also stipulated, that each party should have full power to act in the concern, as to them, or either of them, should appear best for the mutual benefit of the parties. And it was further stipulated, that each party should render an account of all monies received, or expended, on account of this business. It was also provided, that the profits arising out of the business, after deducting the monies which should be advanced by *Sacket,* for the purpose above mentioned, should be equally divided between them ; that the expences of transacting the business, should be borne equally ; and in case no profits should accrue, *Sacket* agreed to sustain the loss of all monies advanced for expences and other purposes. By the agreement, each party was authorised to sell and convey the right of the others, within the limits specified.

It was admitted, that *Sacket,* by virtue of the contract between him and *Bolton,* received the sum of 2000 dollars for his proportion of the avails of the contract between *Kirk* and the petitioners.

The Superior Court adjudged the testimony of the witness to be inadmissible ; and an injunction against proceedings at law upon the notes, having been decreed, the respondents moved for a new trial, on the ground that the court erred in rejecting the testimony of *Sacket ;* which motion was reserved for the consideration of the nine Judges.

*Gould* and *Staples,* in support of the motion. Two questions arise in the present case. In the first place, was *Sacket* a competent witness ? Secondly, would his testimony have been relevant, if admitted ?

1. It is claimed by the petitioners, that *Sacket* was a partner, at least, with *Bolton,* if not such with *Bolton, Kirk* and *Truman ;* and that, therefore, he was interested in the event

of the suit, and was an incompetent witness. *Sacket* was not a partner, even with *Bolton*, except only as to the salt-works. There was no partnership between them as to the general use of the inventions, which were the objects of their contract. This contract was made subsequently to the execution of the contract between *Kirk* and the petitioners; *Sacket*, therefore, had no interest in it, at the time of its execution; he was not a party, and had no concern in making it.

But further, a contract between *Sacket* and *Bolton*, could not make the former a partner with *Kirk*, *Truman* and *Bolton*. *Sacket* could never make that firm accountable to him for the profits of their business. He could only compel *Bolton* to pay him one half of the profits, by virtue of the terms of their contract.

Besides, have *Kirk*, *Truman* and *Bolton* any claim upon *Sacket ?* Certainly not. He came in after the completion of their contract, and purchased certain rights of *Bolton*. There was never any privity between *Sacket*, and *Kirk* and *Truman*.

Again, *Kirk* is dead, and his estate insolvent. *Bolton* cannot, therefore, be made liable through him. But *Bolton* is also dead, and insolvent. There is not, then, even a legal liability upon his representatives. How then can *Sacket* be *subjected ?* How far will the court multiply contingencies to create an interest in the witness?

But further, if *Sacket* was, in any manner, interested in this case, his interest was equally balanced. On the supposition that *Sacket* was a partner with *Bolton* and others, if the respondents should fail to recover in the suits at law, by reason of fraud in the original transaction, then he would be liable to them; but if they should recover, he then would be liable to the petitioners. Upon this principle, therefore, his evidence ought to have been received.

2. Was the testimony of *Sacket* irrelevant ? *Hillhouse* and *Morse*, by their petition, seek a remedy exclusively within the jurisdiction of a court of chancery. Our claim is, that the petitioners induced us to purchase the notes. In a suit in chancery, the respondents may avail themselves of any conscientious defence, to rebut an equity. Where one of

two innocent persons must suffer, by the act of a third person, he who enables such third person to do the act, shall sustain the loss. *Lickbarrow* v. *Mason*, 2 *Term Rep.* 70. *A fortiori*, where the act is done by one of the parties, he shall be liable to all the consequences which may result from it.

*N. Smith* and *R. M. Sherman*, contra.

1. *Sacket* is interested in this suit, directly. Wherever a judgment goes to affect a fund in which the witness is interested, his interest is direct, and he cannot be permitted to testify. So, where a judgment goes to establish a state of things, which will affect the interest of a person, he cannot be a witness.

2. If *Sacket* had been a competent witness, the evidence itself was irrelevant. The notes executed by the petitioners were void. The assignees, therefore, gained nothing by the assignment. The notes were not negotiable; but if they had been such, still, they would have been void, in the hands of the assignees, as the objection against them, is not merely want of consideration, but that they were obtained by fraud.

MITCHELL, Ch. J. The question now presented to the court, is, whether *Sacket* was an incompetent witness, by reason of an interest in the event of the suit?

A decision of the court of chancery, granting the injunction prayed for, would, inevitably, fix the liability of *Kirk, Bolton* and *Truman*, upon their implied contract with *Lucius Smith* & Co. arising from the transfer of the notes which were assigned to them : And in consequence of *Bolton's* being compelled to perform his contract with the purchasers of the notes, *Sacket* would, unavoidably, be obliged to pay back to him, such portion of the avails of the sale, as he might have received.

By a decree in favour of the petitioners, *Sacket's* liability would be as certainly fixed, as if he had entered into a covenant to save *Bolton* harmless against such decree, or had become his bail. Of course, *Sacket* was directly interested to subject the petitioners in the suits at law, upon the notes.

The fact that *Bolton* had previously died insolvent, cannot essentially affect the question; for the court cannot enter into an enquiry relating to the pecuniary resources of the administrators, in this case, with any more propriety, than they could into those of the intestate himself, if he were still living.

The mere liability of the administrators, without a recovery, might raise an equitable claim against *Sacket;* so that he could not, in good conscience, retain the money he had received from *Bolton*, in his life time. A claim of this kind, founded on a liability, as surety, may be proved as a valid claim or debt, under a commission of bankruptcy, in *England*, even before the surety has paid the money. *Toussaint* v. *Martinnant*, 2 *Term Rep.* 100. Nor can this interest of *Sacket*, thus obvious, be said to be balanced, by a similar liability, in case the petitioners should be subjected at law, to the payment of the notes : For if an action of fraud, should, in that event, be brought, the decree in this case, even if between the same parties, would not tend to maintain the issue : Nor would this record be evidence to establish the issue in any action in which *Bolton's* representatives should be a party, as he is not a party in the present suit ; and *Sacket* can be subjected only in consequence of the liability of *Bolton*, or his representatives. Much less would the record be evidence in a suit against *Sacket*. *Sacket's* liability, therefore, for fraud, in consequence of the petitioners being obliged to pay the notes in question, is not such, that he would have been immediately injured, in that event.

The determination of the Superior Court was, therefore, correct; and no new trial ought to be granted.

All the other Judges concurred in this opinion, except *Swift*, J., who was of opinion, that the interest of *Sacket* was balanced, and that his testimony ought, therefore, to have been received.

New trial not to be granted.